UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jessica E. Albornoz,<br><br>   Plaintiff,<br><br>   v.<br><br>Wal-Mart Associates, Inc., et al.,<br><br>   Defendants. | No. 1:22-cv-01229-KJM-CDB<br><br>ORDER |

As explained in this order, genuine disputes of material fact remain to be resolved at trial in this action against defendants Wal-Mart Associates, Inc. and Walmart, Inc. (together, "Walmart" for simplicity) by a former employee, plaintiff Jessica Albornoz. Walmart has shown, however, that Albornoz cannot recover punitive damages and cannot prove Walmart violated California Labor Code provisions related to her requests for employee records. As explained below, the court **grants in part and denies in part** defendant Walmart's motion for summary judgment.

**I.     DISPUTED AND UNDISPUTED FACTS**

Resolution of this case rests on Walmart's policies for employee medical leave and whether Albornoz and Walmart followed them. A summary of those policies is a useful backdrop to the events that ultimately led to the end of Albornoz's employment by Walmart.

1

The policies' terms are largely undisputed, though not entirely. To begin, it is undisputed that employees who take medical leave must submit paperwork to Sedgwick, a third-party company Walmart has engaged to administer employee leave requests. *See* Failla Decl. ¶ 5 & Ex. B at 55,[1] ECF No. 72-5. That paperwork includes forms to be filled out by a healthcare provider, and Walmart's policy provides clearly it is an employee's responsibility to ensure their healthcare provider signs and returns the necessary forms to Sedgwick on time. *See id.* The deadline is "generally" within twenty days, but employees can request more time. *See id.* If paperwork is late or missing, employees "may be deemed to have voluntarily terminated [their] employment." *Id.* at 58.

In addition to these policies, Walmart has a "Leadership Guide" with sections about what managers should do "if an associate," that is, an employee like Albornoz, "asks about taking leave." Dickson Dep. Ex. 12, Pl.'s Evid. App'x Vol. 2 at 92, ECF No. 73-2. Among other things, the guide instructs managers to offer "support and guidance," to direct associates to Sedgwick and to inform associates "they are responsible for calling in to their facility each absence until Sedgwick has communicated a decision on their leave request." *Id.* The guide also has a section about what a manager should do if an associate does not return to work after a leave of absence. *See id.* at 97. "If an associate's leave has ended, but they haven't returned to work or contacted the facility," the guide instructs managers they should "attempt to contact the associate and generate the End of Leave letter." *Id.* This letter explains "next steps," such as "[r]equesting a leave extension through Sedgwick," "an accommodation," or "[v]oluntary termination." *Id.* Finally, the guide has a section about what managers should do when Sedgwick denies leave. *See id.* at 99–100. Among other things, the guide instructs managers to create and send a letter formally denying the leave request, monitor their email, and help associates send any missing paperwork to Sedgwick. *Id.* "Don't take any disciplinary action," the guide also instructs, "until all items outlined by Sedgwick have been completed." *Id.* at 100. Managers "must partner with

---

[1] Deposition transcripts are cited using the reporter page numbers; other record citations refer to page numbers applied by the CM/ECF system.

next-level [Walmart] HR and legal counsel prior to considering termination for absences under the attendance policy." *Id.*

Walmart does not dispute that it created the Leadership Guide, nor that the guide includes the instructions summarized above. It does argue, however, that these instructions are merely a "reference" and not binding. *See, e.g.*, Defs.' Resp. Add'l Fact No. 67, ECF No. 78-1. Despite that argument, it offers no evidence to show beyond dispute that managers had discretion to ignore the Leadership Guide or comply with it selectively.

The events that led to Albornoz's leave of absence and her ultimate separation from Walmart began in March 2022. There was a tragic and untimely death in her family that month. *See* Albornoz Decl. ¶ 3, ECF No. 73-1. Her younger brother shot her older brother in self-defense in their parents' home. *Id.* Albornoz was working as a pharmacy technician at a Walmart store in Tehachapi, California at the time. *See* Albornoz Dep. at 30, ECF No. 72-4; Albornoz Decl. ¶ 2. Early in the morning before her shift, she sent a text message to her supervisor, Jason Salas, to tell him she would not be coming into work because her brother had died, but she did not explain the circumstances of his death. Albornoz Decl. ¶ 4 & Ex. 1; Joint Stmt. Facts ¶ 7. He learned only later that her brother had died in a shooting; he cannot remember exactly when, but it was while she was on leave. Salas Dep. at 84–85, ECF No. 72-4. At the time, in response to her text message, he thanked her for letting him know and excused her. *See* Joint Stmt. Facts ¶¶ 7–8 & Albornoz Dep. Ex. 19. Later that week, Albornoz told Salas she needed "a couple more days" to be with her family. Albornoz Dep. Ex. 19. He approved that request, too, and thanked her again for letting him know. *Id.* He asked if she would be back in the pharmacy for her scheduled shift over the weekend, and she said she would not be back until the next week. *Id.*

Albornoz did return to work the next week, and she was suffering from the symptoms of what would later be diagnosed as "adjustment disorder with mixed anxiety and depressed mood, and grief reaction." Albornoz Decl. ¶¶ 6–7. After seeking medical advice, her healthcare provider advised her not to return to work for a few more days. *See id.* ¶ 7. Based on that advice, she did not work between March 29 and April 3. *Id.* She then returned to the pharmacy and

3

worked on a reduced schedule. Joint Stmt. Facts ¶¶ 9–10; Albornoz Decl. ¶ 8. But after she saw a therapist, she went on a two-week leave of absence for grief and depression. Albornoz Dep. at 201. She sent Salas her doctor's notes, which showed she was excused from work until May 1. *See* Joint Stmt. Facts ¶ 12. Although her leave was initially for just two weeks, i.e., through May 1, Albornoz understood at the time and would testify at trial that her treatment plan had always required a four-week leave of absence. *See* Albornoz Decl. ¶ 8. That is, she did not expect to return to work until at least May 15, not May 1. *See id.*

As required by Walmart's leave policies, Albornoz sent Sedgwick a request for a leave of absence on April 18. *See* Albornoz Dep. Ex. 14 at 153. Sedgwick confirmed it had received her request in a letter. *Id.* The letter instructed her to send her healthcare provider a form to complete and return to Sedgwick within twenty days, i.e., by May 8. *Id.* at 154–55. Sedgwick's letter warned Albornoz her leave request would be denied if the form was late. *Id.* at 155. Sedgwick also emphasized that it would not make "a final decision" about Albornoz's leave request until it received the completed forms from her healthcare provider. *Id.* at 153. Until then, Sedgwick instructed Albornoz "to report each scheduled day missed through [her] normal call-in procedures." *Id.* at 154.

Albornoz did not formally call in her absences every day. *See* Albornoz Decl. ¶ 18. She understood from a previous manager that calling in repeatedly in this circumstance was not truly necessary, and Salas did not ask or remind her to call in, as the leadership guide instructed. *See, e.g., id.* Albornoz and Salas did, however, stay in touch by text. *See id.* ¶ 9 & Ex. 1. A few days before Salas expected Albornoz to be back at work, he texted her to ask if he would see her in the pharmacy the next week. Albornoz Dep. Ex. 19 at 191. She responded that she would be out for another two weeks and would soon have an updated doctor's note to confirm her extended leave. *Id.* But she did not send him another note. *See id.* It is unclear why. Salas and Albornoz also disagree whether Salas tried to follow up about the missing doctor's note. He testified in his deposition that he tried to call her but got only her voicemail, Salas Dep. at 79–80, and he stands by that testimony in a declaration Walmart filed alongside its pending motion, *see* Salas Decl. ¶ 10, ECF No. 72-6. Albornoz has no memory of any calls from Salas at that time, and her phone

4

has no record of any calls from him either. Albornoz Decl. ¶ 21 & Ex. 3. In any event, after Salas learned Albornoz would be out for another two weeks, he asked his own supervisor whether the store could "hire a full-timer . . . and guarantee those hours, considering [Albornoz] might be out for a quite extensive period?" Salas Dep. at 143–44 & Ex. 13.

Meanwhile, the twenty-day deadline of May 8 for Albornoz to send completed medical forms to Sedgwick was approaching. Albornoz was staying with her parents "in a remote, mountainous part of Palmdale, California with limited internet access," so she did not email the leave paperwork for her doctor to complete until April 27. Albornoz Decl. ¶ 10. A few days before the deadline, on May 3, Sedgwick sent Albornoz a follow-up letter and text message warning that it had not yet received her paperwork and reminding her about the approaching deadline. Albornoz Dep. at 114–15, 128 & Ex. 16; Joint Stmt. Facts ¶ 13. This text message "deeply concerned" her. Albornoz Decl. ¶ 11. She was "anxious" she might lose her job. *Id.* She "made several attempts" to call Amber Failla, the Walmart human resources specialist with responsibility for the Tehachapi store, but she could not get through. Albornoz Decl. ¶ 14; *see also* Failla Decl. ¶¶ 1, 6 (describing her position and responsibilities). She did not attempt to contact Salas.

Albornoz did call Sedgwick to say she was having trouble following up with her healthcare providers on May 4, the day after she received Sedgwick's text message. Albornoz Decl. ¶ 12; Albornoz Dep. at 130. Sedgwick told her it would fax copies of the necessary forms to her healthcare providers. Albornoz Decl. ¶ 12; Mohler Dep. at 17, ECF No. 72-4. The evidence does not clarify whether Albornoz asked Sedgwick to extend her May 8 deadline or her leave of absence. In her deposition, she said both that she did make that request and that she did not remember whether she had done so. *Compare* Albornoz Dep. at 125 *with id.* at 183. Sedgwick's own records do not show whether she requested an extension. Mohler Dep. at 33.

At about this same time, on May 4, Sedgwick sent Salas a report about Albornoz's pending leave request. *See* Salas Dep. at 72–73. He forwarded that report to Failla the next day, May 5. *See* Failla Dep. at 63–67. Although the Sedgwick report stated that Albornoz was "currently" on a leave of absence, Failla believed Albornoz's leave had ended on May 1, the

5

return date on the doctor's note she had sent to Salas. *See* Failla Dep. at 67, 72, 100; Failla Decl. ¶ 13; Albornoz Dep. Ex. 19 at 191. For reasons that are unclear, Failla appears not to have known what Albornoz had told Salas about her plan to return to work, i.e., that she expected to be out through mid-May.

Failla called Sedgwick to ask whether Albornoz had submitted any medical forms or had requested an "extension," and Sedgwick reported she had not. Failla Dep. at 69. Failla's deposition testimony about the call is ambiguous: some of her statements suggest she understood Albornoz had not asked to extend her leave; others suggest she believed Albornoz had not asked to extend the deadline for submitting the necessary medical paperwork. *See id.* Sedgwick's representative did later explain in a deposition what the company's answer to Failla's question meant: "the claim had not been approved" at the time, "[s]o there was nothing to extend." Mohler Dep. at 20.

After Failla spoke to Sedgwick, she prepared and sent the "end of leave" letter to Albornoz. Failla Decl. ¶ 17 & Ex. D. The letter stated Albornoz's leave of absence had ended on May 1, which Failla admits now was incorrect: Sedgwick had "actually provided" Albornoz "additional time." *Id.* ¶ 15. The end-of-leave letter instructed Albornoz to contact Failla or Salas "immediately . . . to make plans for [her] return to work or to discuss other options that might be available to [her]." *Id.* Ex. D. It warned that if she did not "take action" within three days of her receipt of the letter, she "may be deemed to have voluntarily terminated [her] employment with Walmart." *Id.*

Albornoz denies receiving the letter, Albornoz Decl. ¶ 24, but there appears to be no dispute that Failla mailed it. Failla produced a receipt confirming she mailed the letter on May 9, and she offered unrebutted testimony in a deposition that her records showed the letter was delivered on May 11. *See* Failla Dep. at 86–87 & Ex. 3. In any event, Albornoz did not respond. *Id.* at 55–60; Albornoz Decl. ¶ 24. Nor did she call in to report further absences, speak to Salas, or submit the required medical documentation to Sedgwick by the May 8 deadline. *See* Failla Dep. at 55–60, 91 & Ex. 3; Failla Decl. ¶ 13; Mohler Dep. at 20, 30; Albornoz Dep. at 131.

6

1   Albornoz avers she was under the mistaken impression during this time that Sedgwick was taking
2   care of any missing paperwork. *See* Albornoz Decl. ¶ 12.

3   After Failla received no response to the end-of-leave letter, she concluded Albornoz had
4   not complied with Walmart's leave policies, and she worked with Salas to terminate Albornoz's
5   employment. *See* Failla Dep. at 91; Failla Decl. ¶¶ 13–16, 18. Walmart does not dispute that
6   Salas urged Failla to move quickly and finalize the termination in an email: "[P]lease let me
7   know," he asked her, "if you have heard from [Albornoz] ASAP. If you haven't, I'd like to begin
8   the termination process." *See* Salas Dep. Ex. 7; Resp. Stmt. Add'l Facts No. 48, ECF No. 78-1.
9   The record reflects Failla did move quickly. The termination was effective on May 12, the very
10  next day after Salas asked Failla to begin the termination process. *See* Failla Decl. ¶ 19; Failla
11  Dep. at 60.

12  Failla and Salas agree they were the only two Walmart employees involved in the decision
13  to terminate Albornoz's employment. *See* Failla Decl. ¶ 18; Salas Decl. ¶ 7. But they also agree
14  it was Failla's decision in the end, not Salas's. *See id.* Salas "fully deferred to Failla's
15  determinations and decisions," and it was his understanding that he "did not have the authority to
16  terminate Albornoz independently." Salas Decl. ¶ 7.

17  Aside from the warning in the end-of-leave letter that a failure to respond could be
18  deemed a voluntary termination, Walmart did not inform Albornoz the company had terminated
19  her employment or why. It did not mail her final paycheck until the next month. *See* Failla Dep.
20  60 & Ex. 3. Albornoz did not learn she had been terminated until Sedgwick informed her it had
21  closed her request for medical leave. Albornoz Decl. ¶¶ 16, 24; Albornoz Dep. at 206–07. She
22  believes Walmart fired her specifically because she sought an extended leave of absence, and she
23  believes Walmart's references to its leave policies are nothing but a convenient pretext. *See*
24  Albornoz Dep. at 206–07, 251, 259. She remembers, for example, when she took a leave of
25  absence the year before she was fired, in 2021, her former manager Jennifer Tran told her it was
26  unnecessary to call in and to leave the paperwork to the company. *See* Albornoz Decl. ¶ 18.[2]

---

[2] Walmart's hearsay objections to Tran's statements are overruled. *See* Evid. Objs. at 9, ECF No. 79. Those statements could likely be reduced to an admissible form at trial, such as

7

1  Salas, by contrast, who was not her supervisor at that time, was "bothered" by her leave of
2  absence in 2021.  Albornoz Dep. at 59–60.  He was "very cold" when she returned.  *Id.*  Albornoz
3  also heard second-hand from Tran that Salas had complained about her decision to take "time off"
4  when there was so much work to do in the pharmacy.  *Id.* at 255–56.  Albornoz also points out
5  how quickly Failla moved to finalize her termination after sending the end-of-leave letter, despite
6  receiving no response; that neither Salas nor Failla called or texted her in early May; neither Salas
7  nor Failla helped her with her medical paperwork, as the leadership guide instructed; and that the
8  company decided to move forward with her termination even though Sedgwick had not finalized
9  its own decision.  *See, e.g.*, Albornoz Decl. ¶¶ 13–25; Opp'n at 15–19, ECF No. 73.

Albornoz filed this case a few months after her termination, *see generally* Compl., Peterson Decl. Ex. A, ECF No. 2; First Am. Compl., Peterson Decl. Ex. A, ECF No. 2.  She asserts several claims under state law:

- Discrimination, retaliation and interference claims under the California Family Rights Act (CFRA), First Am. Compl. ¶¶ 16–38 (citing Cal. Gov't Code § 12945.2);
- Disability discrimination, failure to accommodate a disability, failure to engage in the interactive process and retaliation in violation of the California Fair Employment and Housing Act (FEHA), *id.* ¶¶ 39–71 (citing Cal. Gov't Code § 12940);
- Wrongful termination in violation of public policy, *id.* ¶¶ 72–76;
- Failure to prevent discrimination, *id.* ¶¶ 77–82;
- Failure to allow rest breaks in violation of the California Labor Code, *id.* ¶¶ 83–87 (citing Cal. Lab. Code § 226.7);

---

testimony by Tran or under the rule exempting statements by party opponents from the hearsay rule, *see* Fed. R. Evid. 801(d)(2)(D), so Albornoz may rely on them in opposition to Walmart's motion.  *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) (explaining rules of admissibility at summary judgment); *see also Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979) ("[C]ourts generally are much more lenient with the affidavits of a party opposing a summary judgment motion.").

- Waiting time penalties for late wages after termination in violation of the California Labor Code, *id.* ¶¶ 88–92 (citing Cal. Lab. Code §§ 201, 203);
- Violation of the California Unfair Competition Law, *id.* ¶¶ 93–100 (citing Cal. Bus. & Prof. Code § 17200); and
- Violation of California Labor Code provisions governing payroll and personnel records, *id.* ¶¶ 101–08 (citing Cal. Lab. Code §§ 226, 1198.5).

Walmart moves for summary judgment on each claim, and the matter is fully briefed. *See generally* Mot., ECF No. 72; Mem., ECF No. 72-1; Opp'n, ECF No. 73; Reply, ECF No. 78. The court held a hearing on November 21, 2024. Alisa Goukasian appeared for Albornoz, and Robert Rodriguez appeared for the defense.

**II.     LEGAL STANDARD**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The parties must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

**III.    ANALYSIS**

    **A.     Discrimination and Retaliation (Claims 1, 3, 4 and 7)**

As summarized above, Albornoz asserts discrimination and retaliation claims under both the California Family Rights Act and the Fair Employment and Housing Act. *See* First Am. Compl. ¶¶ 16–22 (CFLA discrimination); *id.* ¶¶ 33–38 (CFLA retaliation); *id.* ¶¶ 39–45 (FEHA discrimination); *id.* ¶¶ 66–71 (FEHA retaliation). These laws are similar, but differ in important respects.

The Fair Employment and Housing Act unambiguously prohibits both discrimination and retaliation. *See* Cal. Gov't Code § 12940(a), (h). The Family Rights Act operates differently. It prohibits retaliation, *see id.* § 12945.2(k), but it does not prohibit "discrimination" on the same terms. Instead, the Family Rights Act makes it unlawful "for an employer to *interfere* with, restrain, or deny the exercise of, or the attempt to exercise" a right guaranteed by the Family Rights Act. *Id.* § 12945.2(q) (emphasis added). And so, claims under the Family Rights Act fall into two categories: "(1) 'interference' claims in which an employee alleges that an employer denied or interfered with her substantive rights to protected medical leave, and (2) 'retaliation' claims in which an employee alleges that she suffered an adverse employment action for exercising her right to CFRA leave." *Rogers v. County of Los Angeles*, 198 Cal. App. 4th 480, 487–88 (2011) (footnote omitted). California courts have sometimes used the words "discrimination" and "retaliation" interchangeably, but they have consistently recognized only two theories of liability—interference and retaliation—as have California federal courts, including this court. *See, e.g.*, *Post v. John F. Otto, Inc.*, No. 20-01174, 2023 WL 2354751, at *3 (E.D. Cal. Mar. 3, 2023); *Richey v. AutoNation, Inc.*, 60 Cal. 4th 909, 920 (2015).

This difference matters because interference claims are measured against a different legal standard than retaliation and discrimination claims. To adjudicate claims of discrimination and retaliation, courts use a three-step test. *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005) (FEHA retaliation); *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000) (FEHA discrimination); *Moore v. Regents of Univ. of Cal.*, 248 Cal. App. 4th 216, 248 (2016) (CFRA retaliation). A plaintiff must first make out a "prima facie case" of discrimination or retaliation. *E.g.*, *Guz*, 24 Cal. 4th at 355. The specifics of that prima facie case vary from one claim to the next, but the basic test is broadly similar in most circumstances. *Id.* In a case of alleged retaliation in violation of the Family Rights Act, for example, a plaintiff must generally show the defendant employer was covered by the Family Rights Act, plaintiff was eligible to take leave and did take a qualifying leave of absence, and then suffered some adverse employment action because of that leave of absence. *See Moore*, 248 Cal. App. 4th at 867. If an employee makes out a prima facie case of retaliation or discrimination, the burden shifts to the employer to come

forward with evidence showing it had a legitimate reason for its actions. *See Guz*, 24 Cal. 4th at 355–56. If the employer sustains its burden, then the burden shifts back to the employee to show the employer's explanation and reasons are pretextual or are otherwise not to be believed. *See id.* at 356. This three-step test does not apply to interference claims under the Family Rights Act. *Faust v. Cal. Portland Cement Co.*, 150 Cal. App. 4th 864, 879 (2007). An interference claim is simpler. It involves no burden-shifting and has two elements: (1) the employee had rights under the Family Rights Act, and (2) the employer interfered with or denied those rights. *Moore*, 248 Cal. App. 4th at 250.

In this case, as summarized above, Albornoz asserts several similar discrimination and retaliation claims under both the Family Rights Act and the Fair Employment and Housing Act. Those claims are functionally identical for purposes of the pending motion. In each, she alleges she was eligible for and entitled to a leave of absence based on her mental health and medical conditions but was terminated because she invoked those rights and had a qualifying "disability." *See* First Am. Compl. ¶ 18 (alleging discrimination based on her termination); *id.* ¶ 35 (alleging retaliation based on her termination); *id.* ¶ 43 (alleging Walmart discriminated against her because it terminated her employment because of her medical condition); *id.* ¶ 69 (relying on the same allegations to support her claim of retaliatory termination). For these reasons, the court will consider these claims together under the three-part burden-shifting test. Then, in a separate section below, the court addresses Albornoz's interference claim under the simpler, two-element test of the Family Rights Act.

To begin, Albornoz has cited evidence she could rely on at trial to make out a prima facie case of discrimination or retaliation at the first step of the three-step test. Although Walmart argues Albornoz did not comply with the company's leave policies, it does not currently dispute that Albornoz's condition and leave request generally entitled her to protections under the Family Rights Act and Fair Employment and Housing Act. Nor is there any question that Albornoz suffered an adverse employment action: her employment was terminated.

Walmart does contend Albornoz "cannot establish that she could have returned to work/performed her essential job duties," as required under the Fair Employment and Housing

Act. Mem. at 12–13. It does not, however, support that argument with citations to undisputed evidence. Albornoz states in a declaration that she could have returned to work after her leave of absence in mid-May, *see* Albornoz Decl. ¶ 20, and at this stage, the court must assume that is so, *see Matsushita*, 475 U.S. at 587–88; *Anderson*, 477 U.S. at 255, even if other evidence might suggest she could not have returned as planned. Any factual dispute is for a jury to resolve.

Walmart also argues Albornoz could not show she was terminated because of her leave request or disability, as required for each of her relevant discrimination and retaliation claims. *See Yanowitz*, 36 Cal. 4th at 1042; *Guz*, 24 Cal. 4th at 354; *Moore*, 248 Cal. App. 4th at 248. Again, however, the evidence is conflicting and disputed. As summarized above, the company moved forward with the termination while Sedgwick was still processing Albornoz's leave request. A jury could reasonably find Failla and Salas acted with unexplained urgency: they did not attempt to contact Albornoz when she did not respond to the end-of-leave letter, and they did not offer support in completing her leave request with Sedgwick, contrary to the instructions in the company's leadership guide. Albornoz also could offer evidence at trial to show Salas was frustrated with her because she had taken leave previously and wanted to replace her, including in the form of her own testimony and that of her former manager, Jennifer Tran. A jury may not ultimately interpret that evidence as Albornoz does, but again, at this stage, the court must assume it would. *See Matsushita*, 475 U.S. at 587–88. In short, there is a genuine dispute of material fact at the first step of the three-step test.

At the second step, Walmart offers evidence of a non-retaliatory, non-discriminatory motive: Albornoz's missing medical paperwork, her ongoing absence from the pharmacy without further contact and her non-compliance with the company's leave policies. It is undisputed Albornoz did not forward a complete medical packet to Sedgwick; she did not send Salas an updated doctor's note related to her absences after May 1. For that reason, the burden shifts back to Albornoz to show Walmart's explanation is not to be believed. *See, e.g.*, *Guz*, 24 Cal. 4th at 356. Although it would be Albornoz's ultimate burden to prove this point at trial, it is Walmart's burden at this juncture to show there are no genuine disputes of material fact; likewise, it is Walmart's burden now to show it is entitled to judgment as a matter of law. *See Nissan Fire &*

12

1  *Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). Albornoz need only
2  come forward with enough evidence to "create a genuine issue of material fact." *Id.* at 1103.

3        Albornoz has carried that burden. A jury could reasonably conclude Failla and Salas
4  finalized her termination with needless haste and without full information. Salas did not tell
5  Failla that Albornoz expected to be on leave through mid-May. Nor did he tell Failla that
6  Albornoz planned to request an extended leave. The evidence is disputed regarding whether
7  Salas attempted to contact Albornoz to ask about an updated doctor's note, as he claims to have
8  done. Sedgwick, moreover, had not made a final decision about Albornoz's leave application
9  when Failla set the termination in motion; it is disputed what Sedgwick told Failla at the time; and
10 there is conflicting evidence regarding what Failla knew about the status of Albornoz's leave
11 application. As noted above, Failla admits she did not know, at the time she completed the end-
12 of-leave letter, that Sedgwick was still waiting for paperwork. *See* Failla Decl. ¶ 15. Based on
13 the present record, a jury could find neither Failla nor Salas called Albornoz after Failla sent the
14 end-of-leave letter. And Failla moved forward with the termination within only a few days after
15 she sent that letter, soon after Salas urged her to move quickly.

16       A jury also could find Walmart strayed from its own policies. Failla and Salas did not
17 follow all the instructions in the company's leadership guide, including instructions to help
18 associates send any missing paperwork to Sedgwick and not to take disciplinary actions until
19 Sedgwick had completed its review. The parties dispute whether the leadership guide's
20 instructions were mandatory or merely a reference, but that dispute must be resolved at trial as
21 well.

22       Finally, the evidence could show Salas and Failla had an incentive to replace Albornoz
23 based on her medical condition and her need to take an extended leave of absence. As noted,
24 Albornoz would testify that Salas had been cold or distant in response to her need to take leave in
25 the past, and he quickly asked his own supervisor whether the pharmacy could hire another
26 employee when Albornoz went on leave. No evidence shows Albornoz had faced any discipline,
27 made any errors, fell short of the company's expectations or otherwise did not meet her job

requirements. A jury could, of course, decide Walmart had no discriminatory or retaliatory motives, but that is not the question here where there are genuine disputes of material facts.

In short, a jury could find Failla and Salas were not concerned with the company's formal policies, the true status of Sedgwick's decision or what the deadlines actually were, but were instead interested in replacing Albornoz with a technician who could help carry a heavy workload, someone who did not have any medical or mental health conditions or need a leave of absence. A jury also could find the company's current emphasis on its policies and procedures is a prototypical pretext, an invention for this litigation. The court therefore denies the motion for summary judgment of claims 1, 3, 4 and 7.

### B. Interference in Violation of the Family Rights Act (Claim 2)

As noted in the previous section, an interference claim under the Family Rights Act has two elements: (1) the employee had rights under the Family Rights Act, and (2) the employer interfered with or denied those rights. *Moore*, 248 Cal. App. 4th at 250. Walmart argues it is entitled to summary judgment of this claim because employers need only grant "reasonable" requests for leave. *See* Mem. at 11. Walmart contends Albornoz did not submit a "reasonable" request because she did not submit a complete medical information packet to Sedgwick. *See id.* at 11–12. That may be so, but the end-of-leave letter is dated May 5, before the May 8 deadline Albornoz had been given, and neither Failla, Salas nor anyone else at the company waited for Sedgwick to complete its review and make a decision about Albornoz's leave request before finalizing her termination. Instead, a jury could find Failla and Salas moved forward before then, as summarized above. The court denies the motion for summary judgment of claim 2.

### C. Reasonable Accommodation and Interactive Process (Claims 5 and 6)

The Fair Employment and Housing Act makes it unlawful "[f]or an employer . . . to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." Cal. Gov't Code § 12940(m)(1). It is also unlawful "[f]or an employer . . . to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an

14

employee . . . with a known physical or mental disability or known medical condition." *Id.* § 12940(n).

Walmart moves for summary judgment of Albornoz's claims under these provisions on the basis of three arguments. First, it contends the company did not have "sufficient notice" of any disability because the doctor's notes Albornoz provided "did not specify the nature of her disability." Mem. at 19. Walmart cites no authority to show an employer is excused from its obligations under § 12940(m) and (n) when employees do not "specify" a diagnosis or other aspects of their medical conditions. Nor can the court find on this record, as a matter of law, that Walmart lacked sufficient information to be on notice. Albornoz sent doctor's notes to her supervisor, and Salas knew and understood some details about her condition and its causes.

Second, Walmart argues Albornoz "failed to submit a release from her doctors stating she could perform her job duties at the time of her separation." Mem. at 20. This argument could be persuasive if Walmart had cited evidence to show it terminated Albornoz based on its understanding about her incapacity to perform her job duties. It has not done so. Albornoz would testify she could have returned to work in mid-May, and as summarized above, a jury could find the company decided to terminate Albornoz's employment while Sedgwick was still deciding whether she qualified for medical leave.

Third, Walmart argues Albornoz could not show the company "bears responsibility for the breakdown in the interactive process." *Id.* "It is well-established," Walmart argues, "that the responsibility to provide timely medical certifications falls on the employee, not the employer." *Id.* (citing *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 265–66 (2000)). *Jensen* does not support Walmart's position. In *Jensen*, Court of Appeal held the defendant company was not entitled to summary judgment because the parties disagreed about whether the employee had made demands of the company in bad faith. *See* 85 Cal. App. 4th at 265–66. Here again, one reasonable interpretation of the evidence in this case would lay the blame at Walmart's feet: it is unclear whether the company even knew Albornoz's application was incomplete when Failla

/////

1  decided to move forward with her termination.  A jury must decide whether Albornoz or Walmart
2  or both were to blame for the breakdown in their communications.
3        The court denies the motion for summary judgment of claims 5 and 6.

### D. Rest Breaks (Claim 10)

In addition to Albornoz's claims about her termination and leave, she asserts a broader claim under a different California statute, which ensures employers offer certain workers fifteen-minute rest breaks during their shifts. *See* First Am. Compl. ¶¶ 83–87.  Walmart contends Albornoz could not prove at trial that she was ever denied a legally required rest break. *See* Mem. at 21–22.  Albornoz would testify at trial that impossibly lean staffing and subtle workplace social pressures often made it virtually impossible for pharmacy technicians to take rest breaks, especially on weekends.  *See* Albornoz Dep. at 269–70.  Technicians often worked alone, without support, and if they took a break, the pharmacy might be forced to close temporarily.  *See id.* When this evidence is viewed in the light most favorable to Albornoz, as it must be at this stage, it could show the company prevented Albornoz from taking rest breaks as a practical matter, contrary to its own formal policy.  "[A]n employer may not undermine a formal policy of providing meal [or rest] breaks by pressuring employees to perform their duties in ways that omit breaks." *Arce v. The Ensign Grp., Inc.*, 96 Cal. App. 5th 622, 632–33 (2023), *review denied* (Jan. 24, 2024) (quoting *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1040 (2012)).

### E. Wrongful Termination (Claim 8), Failure to Prevent Discrimination (Claim 9), Waiting Time Penalties (Claim 11), and Unfair Competition (Claim 12)

Walmart's arguments for summary judgment of claims 8, 9, 11 and 12 are derivative of its arguments for summary judgment of Albornoz's other claims.  *See* Mem. at 21, 22.  Because the court has denied the motion for summary judgment of those other claims, it denies the motion for summary judgment of the derivative claims (8, 9, 11 and 12) as well.

### F. Payroll and Personnel Records (Claims 13 and 14)

At hearing, Albornoz's withdrew her claims for disclosure of payroll and personal records.  A review of the record confirms there is no genuine dispute of fact to resolve with respect to these claims.

The Labor Code gives employees "the right to inspect or receive a copy of records pertaining to their employment, upon reasonable request to the employer." Cal. Lab. Code § 226(b); *see also id.* § 1198.5(a) (providing similarly). This includes information and records related to hours worked, wages earned and similar information. *See id.* § 226(a). Albornoz alleges Walmart did not provide records in response to her counsel's request. *See* First Am. Compl. ¶¶ 101–08. Walmart moves for summary judgment of these claims because (1) it had no obligation to respond to those requests after this lawsuit began, (2) there is no evidence that Albornoz authorized her attorneys to send a request on her behalf, and (3) there is no evidence Walmart received her request. *See* Mem. at 22–23. In response, Albornoz cites no evidence beyond the allegations in her unverified complaint. *See* Opp'n at 23. As she concedes, her allegations do not suffice. *See Anderson*, 477 U.S. at 256. The court grants the motion for summary judgment of claims 13 and 14.

### G. Punitive Damages

Finally, Walmart moves for summary judgment of Albornoz's request for punitive damages. Because Walmart is a corporation, "punitive damage liability is limited to the actions by managing agents who are defined as 'employees who exercise substantial independent authority and judgment over decisions that ultimately determine corporate policy.'" *Wysinger v. Auto. Club of S. California*, 157 Cal. App. 4th 413, 428 (2007) (quoting *White v. Ultramar, Inc.* 21 Cal. 4th 563, 573 (1999)). "[S]upervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents." *Id.* (quoting *White*, 21 Cal. 4th at 577).

Walmart argues none of the employees who handled Albornoz's request for leave is a "managing agent" under this definition. *See* Mem. at 23–24. In response, Albornoz cites evidence showing Salas and Failla did not follow the company's policies and did not consult the store manager. *See* Opp'n at 24. This evidence would not show Failla or Salas had substantial discretionary authority in the corporation, but rather that they lacked this authority. The court grants the motion for summary judgment with respect to Albornoz's request for punitive damages.

### IV. CONCLUSION

The motion for summary judgment is **granted in part and denied in part**. The motion is granted with respect to claims 13 and 14 and the request for punitive damages. The motion is otherwise denied.

A Final Pretrial Conference is set for **June 26, 2025 at 10:00 a.m.** in Courtroom 3 of this district's Sacramento courthouse. The parties should be prepared to confirm a trial date within 60 to 120 days from the date of the Final Pretrial Conference, and should be available for trial accordingly. The parties shall meet and confer and file a joint Pretrial Statement no less than three weeks prior to the Final Pretrial Conference. *See* E.D. Cal. L.R. 282. The provisions of Local Rule 281 shall apply with respect to the matters to be included in the joint pretrial statement. At least one of the attorneys who will conduct the trial for each of the parties shall attend the Final Pretrial Conference. All motions in limine must be filed in conjunction with the joint pretrial statement. In most cases, motions in limine are addressed and resolved on the morning of the first day of trial. The parties may alert the court at the Final Pretrial Conference and in their final Joint Pretrial Statement that a particular motion or motions should be resolved earlier. At the Final Pretrial Conference, the court will set a briefing and hearing schedule on the motions in limine as necessary. The parties are reminded that a motion in limine is a pretrial procedural device designed to address the admissibility of evidence. The court looks with disfavor upon dispositional motions presented at the Final Pretrial Conference or at Trial in the guise of motions in limine.

This order resolves ECF No. 72.

IT IS SO ORDERED.

DATED: May 7, 2025.

SENIOR UNITED STATES DISTRICT JUDGE